DECISION AND JOURNAL ENTRY
 INTRODUCTION {¶ 1} This case involves the permanent custody of three children who were removed from their mother's care due to the family's homelessness and the mother's inability to provide for the family's basic needs. The father of the children abandoned them, and the mother failed to demonstrate that she had learned anything through two years of case planning efforts. The central issue on appeal is whether the evidence supported the trial court's decision that an order of permanent custody is in the children's best interests. This Court has concluded that the evidence presented by the agency fully supports the decision of the trial court.
 BACKGROUND {¶ 2} Norma M. is the mother of six children. At the time of the permanent custody hearing in this matter, her older three children either resided with a relative or had reached the age of majority. Her younger three children are the subjects of this action. They are: D.G., born *Page 2 
June 5, 1999; T.G., born September 23, 2001; and P.G., born March 9, 2003. The father of these children, Donnie G., was not married to the mother, has not had any contact with the children for at least two years, and has not appealed from the judgment of the trial court.
 {¶ 3} Wayne County Children Services apparently had some previous involvement with the family, though the extent of that involvement is, unfortunately, not explained in the record. The present case began when the mother arrived at the Rittman police station with four of her children and indicated that she had nowhere to stay. Children Services paid for a hotel room for the family for a night and attempted to help them find long-term housing, but was unable to do so. The mother was not eligible for some housing options, and other locations had no openings.
 {¶ 4} Children Services filed a complaint in juvenile court on August 11, 2006, alleging that the children were dependent due to their condition or environment. The agency obtained emergency temporary custody of the children, but permitted them to remain with the mother, apparently because they were able to stay with the maternal grandmother.
 {¶ 5} The children were adjudicated dependent and then, at the disposition in November 2006, were placed with their paternal grandparents. The record does not explain the reason for this change in placement, but there is some suggestion that the maternal grandmother's lease limited the number of residents in her apartment and she was unable to keep the entire family with her. Initially, the paternal grandparents supervised mother's visits at their home. After a month, however, the visits were moved to the visitation center because the grandparents felt the mother was not being cooperative in scheduling the visits. In May 2007, the paternal grandparents concluded that they were no longer able to provide the full-time care the children needed, and the children were placed in foster care. The case plan reunification goals for the *Page 3 
mother focused on resolving anger management problems, improving parenting skills, meeting the basic needs of her children, and addressing mental health issues.
 {¶ 6} On July 11, 2008, the agency moved for permanent custody. The mother moved for legal custody. Following a hearing on both motions, the trial court found that the children had been in the temporary custody of the agency for more than twelve of the prior twenty-two months and that permanent custody was in the children's best interests. Consequently, the trial court terminated both parents' rights and placed the children in the permanent custody of the agency. Mother has timely appealed and has assigned two errors for review.
 BEST INTEREST EVIDENCE {¶ 7} The mother's first assignment of error is that the trial court's decision that permanent custody was in the best interests of the children was not supported by the evidence presented at the hearing. Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find by clear and convincing evidence that both prongs of the permanent custody test are satisfied: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least twelve months of the prior twenty-two months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under Section 2151.41.4(E) of the Ohio Revised Code; and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under Section 2151.41.4(D). See R.C. 2151.41.4(B)(1); R.C. 2151.41.4(B)(2); see alsoIn re William S., 75 Ohio St. 3d 95, 98-99 (1996).
 {¶ 8} The trial court found that the first prong of the permanent custody test was satisfied because the children had been in the temporary custody of the agency for more than *Page 4 
twelve of the prior twenty-two months at the time the agency filed its motion for permanent custody. See R.C. 2151.41.4(B)(1)(d). The mother has conceded that finding. The trial court made additional findings regarding several of the factors in Section 2151.41.4(E) of the Revised Code, though the court did not connect any of those findings to the alternative first-prong determination that the children could not or should not be placed with either parent. See R.C. 2151.41.4(B)(1)(a) and R.C. 2151.41.4(E). Because the mother conceded satisfaction of the first prong of the permanent custody test through the twelve-of-twenty-two provision and because the record supports the finding of the trial court on that point, her arguments disputing the additional findings on the factors in Section 2151.41.4(E) are ineffectual and are, therefore, overruled.
 {¶ 9} The mother's challenge regarding the trial court's second-prong determination that permanent custody was in the best interest of the children will, however, be addressed. See R.C. 2151.41.4(B)(1). When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider all the relevant factors, including those enumerated in Section 2151.41.4(D) of the Ohio Revised Code: the relationships of the children, the wishes of the children, the custodial history of the children, the children's need for permanence in their lives, and whether any of the factors in Section 2151.41.4(E)(7)-(11) apply. See R.C. 2151.41.4(D). The agency must prove by clear and convincing evidence that permanent custody is in the best interest of the child. In re D.A., 113 Ohio St. 3d 88, 2007-Ohio-1105, at ¶ 12. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." In re Adoption of Holcomb,18 Ohio St. 3d 361, 368 (1985) (quoting Cross v. Ledford, 161 Ohio St. 469, paragraph three of the syllabus (1954)). *Page 5 
 {¶ 10} The first best interest factor requires the trial court to consider the interaction and interrelationship of the children with their parents, siblings, relatives, foster caregivers and out-of-home providers. R.C. 2151.41.4(D)(1). At the time the children were removed from their home, each of them was reported to have behavioral problems and special needs, as well as to exhibit signs of abuse and/or neglect. Caseworker Michele May testified that their behaviors were very poor. All three children had poor hygiene and lacked basic knowledge of how to bathe themselves or brush their teeth. All had dental problems. Seven-year-old D.G. used baby-talk. He reported that his two older brothers had abused him. They had given him a black eye, tied him up, and beaten him with a belt while his mother was upstairs in the house. P.G. had speech delays and similarly reported that his siblings were mean to him. The youngest child, T.G., was very delayed in her speech, and her teeth were in the worst condition. Several of her teeth were broken off, as from blunt force, and they were black. The two youngest children were consumed with food issues. They constantly asked whether there was enough money for food and whether there was enough food to eat in the house.
 {¶ 11} Caseworker Laurie Sanders testified that all three children had improved while in foster care. They all had been placed on individualized education plans, and were receiving a good deal of attention at school and in their foster homes. D.G. began receiving medication for attention deficit-hyperactivity disorder, and his school work was improving. The speech of both P.G. and T.G. was improving. Because of the special needs of these children, Ms. Sanders explained that their caregivers must be insightful and willing to accept direction from educators and providers. She testified that she did not believe that their mother can meet those needs because she does not recognize that there are any problems. *Page 6 
 {¶ 12} There was no evidence that the children had much of a positive bond with each other. T.G. and P.G. were initially placed together in the same foster home, but did not do well together. After an incident of sexualized behavior, T.G. was moved to a separate foster home. D.G. and P.G. also did not do well together. In fact, D.G. told the guardian ad litem that being with P.G. "stresses me out." He was more comfortable with his foster siblings.
 {¶ 13} According to Teresa Barrington, the guardian ad litem, the children were each very happy with their respective foster families and were making good progress Ms. Barrington said that they were in healthy situations and were receiving love, support, and attention to their special needs. When she visited them in their foster homes, D.G. proudly showed her his improved report card, T.G. was pleased with her teeth, and P.G. happily showed her his room. T.G. and P.G. were even excited about such things as their hand soap. The foster parents of each child testified that the children had assimilated into their families. Based on these facts, the trial court found that the children had each developed a strong bond with their own foster families.
 {¶ 14} Several of the service providers addressed the mother's relationship and interaction with her children. None concluded that there was a positive bond between the mother and her children or that she would be able to provide good care for the children at any time soon. Dr. Ralph Huhn Jr. counseled the mother on two occasions. The first was a condition of probation following a criminal conviction for violence involving an older son. The second was for this case. Dr. Huhn's conclusions were consistent on each occasion. He explained that the mother sat through counseling sessions on anger management and parenting, but he did not believe she benefitted or learned anything from them. He believed she had difficulty understanding the concepts. In addition, he found that her judgment was poor and her insight into her problems was limited. *Page 7 
 {¶ 15} Dr. Huhn also believed the mother had a misplaced focus on what she perceived as the "bad people" at Children Services, as opposed to accomplishing her personal goals. Based on the fact that the mother had failed to make any real changes in her life towards creating an appropriate environment for her children over the prior two years, Dr. Huhn concluded that she was not able to meet the basic needs of her children and, moreover, he believed that it was unlikely she could benefit from any additional counseling sessions.
 {¶ 16} Michelle May, the first caseworker assigned to this case, testified that the mother refused to sign releases for anger management or parenting classes, and the agency could not, therefore, verify her attendance or whether the substance of the programs satisfied the agency's requirements. Ms. May emphasized that case plan compliance would, in any event, include a demonstration of skills learned. Notwithstanding the mother's failure to sign releases, Ms. May believed the mother did not demonstrate any skills she may have been taught in anger management or in parenting classes.
 {¶ 17} In February 2008, Children Services and the guardian ad litem jointly requested a suspension of visitation because of the destructive effect the visits were having on the behavior of the children. Caseworker Sanders and the paternal grandmother had both expressed concern about the mother communicating provocative ideas to the children during visits, such as encouraging them to disobey the foster parents, to believe that the foster parents were mean, and to taunt their dogs into biting them. The paternal grandmother testified that D.G. looked relieved when she told him he did not have to do anything except be a little boy. The guardian ad litem conveyed a conversation with P.G., who first reported that he was not safe with the foster parents and they were mean to him, but then admitted that his mother insisted he say that and, further, that it was a "fib." The trial court did suspend visitation and sought verification of the mother's *Page 8 
participation in classes in addition to urging completion of the psychological evaluation so that the court could properly evaluate the question of custody of these children.
 {¶ 18} The matter of the mother whispering things to her children developed into more of a concern in light of the fact that P.G. was actually bitten by a dog in his foster home. The child received a ¼" cut and was medically treated with two stitches. That medical treatment caused him to be late for a visit with his mother at the visitation center. According to the case aide, who was present when the mother was informed of the dog bite, the mother reacted in a disproportionate manner that caused the case aide to feel threatened. The mother threw her hands up in the air, pounded her fist into her hand, cursed, screamed, kept repeating "he what, he what" and slammed a door as she left the room. When the foster parents arrived at the visitation center, the mother approached the foster parents and P.G. and continued the same behavior. According to an affidavit by Caseworker May, the mother shouted: "God have mercy on my soul because I am not going to show you any mercy." P.G. appeared frightened and began to cry.
 {¶ 19} Teresa Barrington, the children's guardian ad litem, testified that the mother believed her children were normal, that they had no problems or special needs, and that they did better with her than with their foster parents. According to the guardian ad litem, the mother's mistrust of the agency consumed her and made case management progress very difficult. Ms. Barrington believed that the mother had only gone through the motions of attending classes and counseling sessions because they were court-ordered, but did not learn anything from them. She also emphasized that the mother had a very limited ability to gain anything from those sessions due to her cognitive limitations and her refusal to acknowledge the existence of any problems. *Page 9 
 {¶ 20} Based on this record, the trial court found that none of the children was bonded to the mother, the father, or each other. There was no evidence that the children had a continuing and positive relationship with any other relatives. The only positive bond that the children had at the time of the permanent custody hearing was with their foster families.
 {¶ 21} In her appellate argument, the mother has disputed the trial court's finding that there is no bond between her and the children. In an attempt to challenge that finding, the mother has cited: (1) the fact that she was upset because T.G. referred to her foster parents as "Mommy Sue and Daddy Bill"; (2) evidence that she was convinced that the agency was determined to take her children away; (3) evidence that she urged the children to mistrust their foster parents and misbehave while with them; and (4) her intense reaction to the news that P.G. was bitten by a dog in his foster home. The mother has pointed to this evidence in the belief that it demonstrates a connection, loyalty, and affection towards her children, even though she admits that it also reflects hostility or mistrust of those she feels are coming between her and her children.
 {¶ 22} The argument is mistaken and ill-founded. It is implicit that an evaluation of personal relationships for the purpose of a best interest determination should be grounded on constructive and healthy relationships and not on offensive and reprehensible behavior. Although the mother proclaimed love for her children, she has not been able to express that love in a manner that is beneficial to her children. Moreover, the cited evidence demonstrates only that the mother believes she cares about her children; her behavior, however, is consistently contrary to the best interest of the children.
 {¶ 23} Finally, the mother has argued that the father's abandonment of the children has colored the trial court's view of her. As proof, she states that the trial court made many findings *Page 10 
related to the father. The trial court's decision, however, does not contain an inordinate number of findings related to the father. In fact, the trial court was required by the statutes in Chapter 2151 of the Revised Code to assess and make numerous findings regarding the status of both parents and the ability of each of them to assume custody of the children in the process of considering a motion to terminate parental rights.
 {¶ 24} The second best interest factor requires consideration of the wishes of the children. Ms. Barrington, the guardian ad litem, testified that each of the children wished to remain with his or her foster parents. She explained that D.G. has repeatedly said that he wanted to remain with his foster parents until he is forty-six years old and would then return to his mother. Regarding P.G., Ms. Barrington said that he was happy with his foster parents, very much wanted to be a part of that family, and was even using their last name. The guardian ad litem stated that P.G. had specifically and repeatedly told her he wanted to stay with his foster family. Regarding T.G., Ms. Barrington testified that she also wanted to remain in her foster home. She explained that T.G. got very nervous at the time of scheduled visits with her mother and, before the trial court suspended the visits, did not want to attend them. According to the guardian ad litem, T.G. was happy with her foster family and doing very well in their care.
 {¶ 25} The mother has argued that D.G. would prefer to return to her care. In support of that position, she has cited testimony by D.G.'s foster father and has asserted that D.G. would like to stay with his foster parents only if going back to his mother is not an option. The referenced testimony of D.G.'s foster father was as follows:
 "Q. Has he ever expressed his intentions about remaining with you?
 "A. He has said that if going back to his mom wasn't an option he wants to stay with us and he said that he would stay until he's 46 so." *Page 11 
 {¶ 26} The guardian ad litem explained that D.G. loves his mother and would never be able to explicitly say that he did not want to return to her. In addition, D.G. always had a great deal of responsibility for his younger siblings. Ms. Barrington believed that D.G. was very happy in his foster home and felt guilty about leaving his mother. On the whole, the guardian ad litem believed D.G. would like to remain with his foster parents.
 {¶ 27} The guardian ad litem explained that her focus was on the best interest of the children. The children had been in temporary custody for almost two years and, in her view, the children would not be able to reunify with their mother any time soon. The guardian ad litem concluded that it was in the best interest of all three children to be placed in the permanent custody of the agency.
 {¶ 28} The third best interest factor is the custodial history of the children. At the time of their removal from their mother, they were seven, five, and three years old. They resided with the maternal grandmother briefly, were next placed with the paternal grandparents for approximately six months, and were then moved to foster care. T.G. and P.G. were placed together from October 2007 until March 2008, when T.G. was removed to another foster home. D.G. was in a separate foster home the entire time. The children had been in temporary care for nearly two years by the time of the permanent custody hearing.
 {¶ 29} In her argument regarding this best interest factor, the mother has noted that the "talisman of `twelve of twenty-two'" has been criticized as being overly technical and of questionable constitutionality. Admittedly, that criticism has been lodged by some Ohio jurists in regard to Section 2151.41.4(B)(1)(d), the first prong of the permanent custody test. See, e.g., In re Alexis K.,160 Ohio App. 3d 32, 2005-Ohio-1380, at ¶ 58-59 and In re Michael Laird, 9th Dist. No. 01CA0005, 2001 WL 54232 at *6-7 (May 23, 2001) (Carr, J., concurring). To apply *Page 12 
this criticism to the third best interest factor in this case, however, is inappropriate. First, the mother has conceded that the children were in the temporary custody of the agency for more than twelve of the prior twenty-two months and that Section 2151.41.4(B)(1)(d), representing the first prong of the permanent custody test, has been satisfied by that fact. She has not challenged the constitutionality of that statute. Second, the length of temporary custody as part of the best interest test, set forth in Section 2151.41.4(D), is a different matter. In that section, the fundamental concern is the custodial history of the child in general. The trial court may consider the length of time the child has been in any of his or her placements, the reasons for those placements, and any other factors relevant to the child's custodial history. The mother has not cited any authority that specifically criticizes the "twelve-of twenty-two" reference within the third best interest factor, nor did she preserve that issue for appeal.
 {¶ 30} Fourth, there was evidence before the trial court that the children need a legally secure permanent placement and that such permanence cannot be achieved without a grant of permanent custody to the agency. Caseworker Sanders believes that the children need a permanent placement in order to have the stability and consistency that come from such a placement. She and the guardian ad litem both believed that reunification was no longer in the children's best interest. The mother's failure to acknowledge problems and address them has resulted in an inability of the mother to meet the children's needs now or at any time in the reasonable future. At the same time, the children have been in foster care nearly two years and are thriving there. The foster parents of each child testified that the children had assimilated into their families and that they were interested in adopting their respective foster children if permanent custody were awarded. *Page 13 
 {¶ 31} Given the ample evidence before the trial court, it reasonably concluded that permanent custody was in the best interest of the children. The mother's first assignment of error is overruled.
 HEARSAY {¶ 32} The mother's second assignment of error is that the trial court incorrectly allowed hearsay testimony into evidence. This assignment of error is without merit. As this Court explained in In re D.B., 9th Dist. Nos. 03CA0015-M and 03CA0018-M, 2003-Ohio-4526, at ¶ 9, because this hearing was held before a judge and without a jury, the trial judge is presumed to have considered only properly admissible evidence unless the record affirmatively demonstrates otherwise. "The trial court is presumed to disregard hearsay and the burden is on appellant to overcome this presumption by showing that the trial court relied on hearsay in its decision." In re Brock, 12th Dist. No. CA98-03-027, 1998 WL 4554 at *6 (Oct. 5, 1998) (citing In re Colter, 12th Dist. No. CA89-07-011,1990 WL 44703 at *3 (Apr.16, 1990)). The mother has not overcome the presumption that the trial judge considered only properly admissible evidence in reaching his decision. She has offered no argument whatsoever that suggests that the trial court relied upon improperly admitted hearsay.
 {¶ 33} In addition, this Court is compelled to note that most of the matters to which the mother objects in her appellate argument are not specifically pointed out in the record as required by the rules of appellate procedure. It is not sufficient to refer to "a free-for-all" of hearsay statements of the children or to complain generally of "any hearsay-within-hearsay" contained within four exhibits. In making an appellate argument, the appellant is obligated to refer to the places in the record on which he or she relies. App. R. 16(A)(7). In addition, if the admissibility of evidence is in controversy, an appellant must support his or her contentions with references to *Page 14 
"the pages of the transcript at which the evidence was identified, offered, and received or rejected." App. R. 16 (D). Rule 7(F) of the Local Rules of the Ninth Appellate District requires that references identify "the exact location" in the record to which the court must refer and that such references "shall be included in the statement of facts and in the argument section of the brief." Loc. R. 7(F).
 {¶ 34} For the most part, the mother has failed to identify specific examples of purported hearsay and has also failed to indicate their location in the record. An appellate court may decline to address any alleged error if the appellant has failed to comply with Rule 16 of the Ohio Rules of Appellate Procedure. Arn v. Arn, 9th Dist. No. 21078, 2003-Ohio-3794, at ¶ 15. "It is not the duty of this court to search the record for evidence to support an appellant's argument as to alleged error." Berthelot v. Berthelot, 154 Ohio App.3d 101, 2003-Ohio-4519, at ¶ 31 (quoting Gest v. Gest, 9th Dist. No. 96CA006580, 1998 WL 208872
(Apr. 19, 1998)). Similarly, Rule 7(F) of the Local Rules of the Ninth Appellate District specifically indicates that the court may disregard the assignment of error or argument if the appellant has failed to include a reference to a part of the record necessary to the court's review. Loc. R. 7(F). Absent compliance with these procedures, this Court is unable to perform its proper reviewing function. Accordingly, the mother's second assignment of error is overruled.
 CONCLUSION {¶ 35} The mother's assignments of error are overruled. The judgment of the Wayne County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal. *Page 15 
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to appellant.
BELFANCE, J. CONCURS.