[Cite as *In re E.G.*, 2017-Ohio-2584.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
|---|---|---|---|
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF MEDINA | ) | | |

IN RE: E.G.

C.A. No.     16CA0075-M

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF MEDINA, OHIO
CASE No.     2015 07 NE 0032

DECISION AND JOURNAL ENTRY

Dated: May 1, 2017

SCHAFER, Presiding Judge.

{¶1}    Appellant M.G. ("Mother") appeals the judgment of the Medina County Court of Common Pleas, Juvenile Division, that granted legal custody of the child E.G. to the paternal grandparents ("Grandparents"). This Court affirms.

I.

{¶2}    Mother and the child's father ("Father") were married for a brief period of time and had three children together. E.G. (d.o.b. 2/23/08) was their firstborn child. One of their three children died at the age of five months from an undetermined cause. After the parents divorced, Father received custody of E.G. and the third child. Mother moved to New York with her son by another man. Thereafter, the parents' third child also died from an undetermined cause. Instead of reporting the child's death and properly addressing the situation, Father left the child's body in a crib and told E.G. and Grandparents that the other child was at daycare. The deceased child's body was found by a utility worker who reported it to the police. Father was

arrested, and Medina County Job and Family Services ("JFS") took E.G. into care. The family had a prior history with the public child welfare agencies in Cuyahoga County and New York state, and E.G. had been removed from the family home twice before.

{¶3} JFS filed a complaint alleging that E.G. was neglected and dependent on multiple bases. After a hearing, the agency obtained predispositional custody and placed the child with Grandparents, with whom she had resided when she was previously removed from the home. At the adjudicatory hearing, JFS dismissed some of the allegations. The juvenile court subsequently adjudicated E.G. neglected as to Father and dependent as to both Father and Mother.

{¶4} After being granted leave to intervene, Grandparents filed a motion for legal custody. At the initial dispositional hearing, the parties agreed to an award of temporary custody to the agency, and the court held the motion for legal custody in abeyance. The juvenile court adopted the case plan submitted by JFS.

{¶5} At the next two review hearings, the juvenile court continued E.G. in the temporary custody of JFS, and the child remained in her placement with Grandparents. Eleven months after filing its complaint, JFS also filed a motion for legal custody to Grandparents. Mother filed a motion to extend temporary custody for six months, which Grandparents opposed. The matter came before the juvenile court for final dispositional hearing, after which the court granted legal custody to Grandparents and denied Mother's motion for a six-month extension of temporary custody. Mother filed a timely appeal in which she raises two assignments of error for review.

II.

**Assignment of Error I**

**The trial court erred in granting [legal] custody to paternal grandparents as it was against the manifest weight of the evidence[.]**

**{¶6}** Mother argues that the juvenile court's award of legal custody of E.G. to Grandparents was against the manifest weight of the evidence. This Court disagrees.

**{¶7}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

**{¶8}** "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the child. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, citing *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the child, the child's wishes, the custodial history of the child, the child's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist.

Summit Nos. 26976, 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850, 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the child's adjustment to her environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶9} Mother and Father had an on again/off again relationship for ten years. E.G. was born several years before her parents got married in 2012. In addition, Mother had a son by another man prior to her marriage to Father. Mother has a history of drug abuse, and her son was born with cocaine in his system. Although the record is unclear as to the exact reason, there was evidence that both E.G. and her brother were removed from either Mother's or both parents' care and placed in foster care while they were living in New York. Mother and Father subsequently relocated to Cuyahoga County, Ohio. Mother gave birth to a daughter in October 2012. Based on prior referrals to the agency, Cuyahoga County Children and Family Services ("CCCFS") worked with the family after the birth of Mother's third child.[1] That child died at the age of five months for indeterminable reasons. Mother was subsequently hospitalized for homicidal thoughts against Father, although she claimed that she entered the hospital for psychiatric care simply because she "needed a break." She was diagnosed with bipolar disorder. She declined to take her prescribed medications, however, because she did not want the stigma of a mental illness diagnosis.

---

[1] From 2012 through 2015, CCCFS received ten or eleven referrals regarding the parents' children.

**{¶10}** In March 2014, shortly after Mother and Father had their third daughter, CCCFS removed E.G. from the home based on referrals that there was drug abuse in the home by both parents, and that E.G. had missed a lot of school. Grandparents were in Florida at the time and unable to accept immediate placement. They informed the agency, however, that they were willing to accept placement of the child in a few months at the end of the school year, because they did not want to disrupt E.G. from yet another school. At the time of her removal, she had already been in two schools and was attending a third while with the foster family. E.G. spent approximately nine months in Grandparents' home during the pendency of the CCCFS case.

**{¶11}** Mother and Father were divorced in early December 2014. E.G. was not a subject of the divorce decree, because she was a subject of the pending juvenile dependency/neglect/abuse[2] case. E.G.'s sister, however, was not subject to the jurisdiction of the juvenile court. Mother read a portion of the parties' divorce decree into the record. The provision indicated her agreement that, because she was not compliant with case plan objectives in the juvenile case, she posed a potential threat to her daughter's (E.G.'s sister) health, safety, and welfare. And because Father was compliant, she agreed that he would receive custody of that child. Mother admitted that she signed the agreement included in the divorce decree, but denied having ever read it. Mother was aware, however, that Father obtained custody of that child from the divorce. He further regained legal custody of E.G. through the CCCFS case based on his successful completion of case plan objectives and Mother's failure to comply with hers. Father moved to Medina County with the girls. Mother relocated to New York with her son in January 2015. It is unclear from the record exactly how much contact Mother had with E.G.

---

[2] We use this phrase generically, because the record does not contain the child's precise adjudication.

from January through July 2015, when JFS filed the instant complaint; but it appears to have been quite limited.

{¶12} In July 2015, E.G. was removed from a parent's custody for a third time by a child welfare agency. Her removal was based on the discovery of her sister's corpse in Father's apartment and the unknown whereabouts of Mother. E.G. was immediately placed with Grandparents, where she remained during the 12-month pendency of this case.

{¶13} Grandparents facilitate and supervise telephone visitations between Mother and the child. They were agreeable when Mother requested adding a third weekly telephone call. Those visits generally go well, although Mother has had to be reminded several times not to discuss certain matters beyond the boundaries established by JFS and the child's counselor. Those matters involved discussions regarding times Mother expected to visit the child or obtain reunification. The child has a good relationship with both her younger brother and Mother, whom she sees approximately once a month.

{¶14} By all accounts, E.G. has thrived in Grandparents' care. The caseworker, guardian ad litem, child's prior counselor, and school teacher all testified regarding the apparent close bond between the child and Grandparents. The child's needs are well met; she attends school regularly and excels academically; she is involved in age-appropriate extracurricular activities; she has adapted socially and is well-liked by her peers; and she has developed the skills necessary to cope with the stressors, disruptions, and chaos in her short life. Despite three removals from her parents' custody, multiple relocations during her life, the death of two sisters, her mother's relocation out of state, and her father's incarceration, E.G. has adjusted well to her environment in Grandparents' care.

**{¶15}** In the meantime, Mother has failed to demonstrate that she can provide the needed stability for E.G. Although the caseworker testified that Mother has generally complied with her case plan objectives, this Court has repeatedly recognized that, while relevant to the juvenile court's best interest determination, case plan compliance is not dispositive of the issue. *See In re T.W.*, 9th Dist. Summit No. 27477, 2016-Ohio-92, ¶ 17; *see also in re K.C.*, 9th Dist. Summit Nos. 26992, 26993, 2014-Ohio-372, ¶ 22, citing *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 21. In this case, Mother's case plan objectives included (1) cooperate and actively participate in services; follow all recommendations; execute any necessary releases for information; update the agency regarding any changes in address, contact information, employment, and household members; and allow monthly visits to her home; (2) complete a parenting evaluation and follow all recommendations; (3) complete a diagnostic evaluation to identify any undiagnosed mental health or substance abuse issues; participate in any recommended treatment programs; and follow all recommendations; and (4) provide proof of income and her lease agreement.

**{¶16}** As part of the first case plan objective, Mother submitted to the home study requested by the agency. The JFS case worker testified that Mother's out of state residence necessitated a home study pursuant to the interstate compact placement of children system. The Chautauqua County (New York) Department of Health and Human Services conducted the home study and submitted a report.

**{¶17}** The New York caseworker reported that, although the physical aspects of the home were adequate, she did not recommend placement with Mother based on multiple concerns. The caseworker found Mother to be "overwhelmed" by the trauma in her life, and focused primarily on the death of her daughter. She opined that "a considerable amount of

therapeutic intervention" was necessary before Mother would be able to rebuild a safe and healthy relationship with E.G. The caseworker was further particularly concerned about Mother's relationship with her current fiancé with whom she lived. The fiancé was not forthcoming about his criminal history, and he became verbally aggressive with both Mother and the caseworker regarding the home study. A partial records check indicated that the fiancé had multiple criminal charges between 1992 and 2003. A records request from the local sheriff's office had not been fulfilled by the time of the hearing. In addition, the caseworker noted that Mother had reported to her mental health treatment provider incidents of violence and arguing with her fiancé. Based on these concerns, the New York caseworker opined that it would not be in E.G.'s best interest to be placed in Mother's care. As the New York agency could not approve Mother's home based on its home study, the JFS caseworker explained that his agency was precluded from placing the child in Mother's home. Moreover, the New York agency would not conduct another home study until six months had elapsed after a prior study indicated the home was not a viable placement. The original home study took approximately three months to complete.

{¶18} In compliance with her second case plan objective, Mother completed a parenting evaluation with Robin Tener, Ph.D. at Northeast Ohio Behavioral Health. Dr. Tener submitted a report dated approximately two months before the dispositional hearing. She concurred in Mother's previous diagnosis of bipolar disorder, and opined that Mother additionally likely suffers from histrionic personality disorder, narcissistic personality disorder, borderline personality disorder, and a mood disorder. These disorders manifest in deficient cognition, affectivity, interpersonal functioning, and impulse control. In addition, Mother exhibits self-dramatization, grandiosity, a sense of entitlement, and instability in personal relationships.

Indeed, Mother's self-reported history seems incredible and paints a concerning picture of how she has functioned throughout her life. Dr. Tener further recognized an historic pattern of substance abuse by Mother, including during pregnancy. In conclusion, based on her extensive testing and interviews with Mother, Dr. Tener suggested that the juvenile court "exercise caution" in determining which custodial and companionship arrangements would be in the best interest of the child.

{¶19} Pursuant to her third case plan objective, Mother was to submit to a diagnostic evaluation to determine undiagnosed mental health or substance abuse issues. JFS accepted an evaluation Mother had done in April 2015, prior to the agency's involvement with E.G. It was recommended that Mother participate in psychiatric services and individual counseling to address bipolar disorder, cocaine abuse, and post-traumatic stress disorder ("PTSD"). That final diagnosis was based on Mother's reports of having been sexually abused from the ages of 11 until 17, and also having been a victim in one of the New York City towers on 9/11. Dr. Tener did not later concur in Mother's PTSD diagnosis, given discrepancies in the history Mother reported to her. Mother engaged in counseling and psychiatric services, but missed several sessions. Her counselor sent two letters to JFS, updating the agency on Mother's progress. Despite the recommendation that Mother address her bipolar disorder during sessions, the counselor reported that she instead could only address the immediate crisis situations Mother was experiencing. Accordingly, the counselor wrote that Mother has yet to begin addressing her underlying bipolar issues.

{¶20} Mother complied with her fourth case plan objective by providing proof of her receipt of social security disability payments for herself and her autistic son. She receives $750 per month for each of them. She had also been receiving a like amount for E.G. based on her

assertions to the social security administration that return of the child to her care was imminent. Those payments were discontinued when the child was not placed with Mother during the pendency of the case.

{¶21} Besides Mother's mental health and substance abuse issues, there was no evidence that she suffered from other health concerns that would hinder her ability to care for E.G. She has family in the area where she lives, although there was some evidence that she was estranged from many family members, including both biological siblings and foster siblings. The evidence established that Grandparents are in good health, and that their daughter lives nearby and spends a lot of time with them and E.G.

{¶22} E.G. has been removed from her parents' homes three times during her eight-year life. She has spent approximately 22 months out of the past 26 months with Grandparents. The caseworker, guardian ad litem, and Grandfather all testified that E.G. requires the stability in her life that Grandparents can and are willing to provide. They all agreed that Mother is not in a position to provide the necessary stability to the child, due in large part to concerns about her mental health and historic drug abuse issues. Even Mother agreed that there were "serious concerns" about her ability to provide a stable environment for E.G. The child's counselor declined to make any recommendation regarding custody or parenting time with Mother and E.G., but she testified that she would hesitate to change anything that might affect the child's emotional state.

{¶23} Based on a review of the evidence, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice in awarding legal custody of E.G. to Grandparents. The critical inquiry before awarding legal custody is to consider the current parenting abilities of each potential custodian and to determine whether it is

in the best interest of the child to be placed in the legal custody of any of them. *See In re K.C.*, 2014-Ohio-372, at ¶ 20. The evidence in this case established that E.G. had experienced chaos and instability in her life due, in significant part, to Mother's mental health and substance abuse issues. Mother admitted that she was still experiencing problems impacting her ability to parent effectively when Father obtained custody of E.G. and her sister. Mother left the state with her son, and had limited contact with E.G. Grandparents, however, have been a dependable source of stability for the child. They have twice happily accepted placement, and E.G. thrives in their care. All of the child's needs are being met, and Grandparents facilitate and encourage an ongoing relationship and contact with Mother. Under the circumstances, the juvenile court's finding that an award of legal custody to Grandparents was in the child's best interest was not against the manifest weight of the evidence. Mother's first assignment of error is overruled.

### Assignment of Error II

**The trial court abused its discretion in failing to grant a six-month extension on [Mother's] case plan.**

{¶24} Mother argues that the juvenile court erred by denying her motion for a six-month extension of temporary custody. This Court disagrees.

{¶25} The decision to grant or deny a six-month extension of temporary custody lies within the discretion of the juvenile court and will not be reversed absent an abuse of discretion. *In re S.N.*, 9th Dist. Summit No. 23571, 2007-Ohio-2196, ¶ 16. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶26} In support of her argument, Mother cites *In re C.S.*, 9th Dist. Summit No. 27783, 2015-Ohio-5244, ¶ 8, for the following proposition:

> A trial court may grant an extension of temporary custody if it determines, by clear and convincing evidence, that: (1) the extension is in the best interest of the child; (2) there has been significant progress on the case plan of the child; and (3) there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension.

She then asserts that "[t]here is no reason to believe that extending the case plan six months wasn't in the best interest of E.G. Further, there was significant progress made on the case plan and E.G. could have been reunified with Mother within that time period." She presents no factual support for her assertions other than to write that "[t]here was ample testimony that E.G. and Mother had an extremely positive relationship."

{¶27} Rather than supporting her argument with citations to authority and portions of the record substantiating her claims, as required by App.R. 16(A)(7)/(D) and Loc.R. 7(F), Mother offers mere conclusory statements parroting the legal test. Conclusions without an evidentiary basis fail to provide this Court with a valid basis on which to disturb the judgment of the trial court. As we have repeatedly written, it is not the duty of this Court to scour the record for evidence and construct an argument on an appellant's behalf. *See e.g., In re D.G.* 9th Dist. Wayne No. 08-CA-0062, 2009-Ohio-2080, ¶ 34; *see also, Berthelot v. Berthelot*, 154 Ohio App.3d 101, 2003-Ohio-4519, ¶ 31 (9th Dist.), citing *Gest v. Gest*, 9th Dist. Lorain No. 96CA006580, 1998 WL 208872, *1 (Apr. 19, 1998). Accordingly, we may disregard Mother's second assignment of error. *In re D.G.* at ¶ 34, citing Loc.R. 7(F).

{¶28} Moreover, this Court has held that "'[w]here the trial court finds that it is in the best interest of a child to be placed in legal custody as a permanent disposition, the trial court must necessarily deny an extension of temporary custody.'" *In re B.C.*, 2014-Ohio-2748, at ¶ 22,

quoting *In re C.M.*, 9th Dist. Summit No. 24380, 2009-Ohio-943, ¶ 24. Because we upheld the juvenile court's finding that an award of legal custody to Grandparents was in the child's best interest, we further conclude that the juvenile court did not abuse its discretion by denying Mother's motion for a six-month extension of temporary custody. Mother's second assignment of error is overruled.

## III.

{¶29} Mother's assignments of error are overruled. The judgment of the Medina County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Medina, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JULIE A. SCHAFER
FOR THE COURT

TEODOSIO, J.
CALLAHAN, J.
CONCUR.


APPEARANCES:

WILLIAM HANEK, Attorney at Law, for Appellant.

STEVEN WOLKIN, Attorney at Law, for Appellee.

JENNIFER MOORE, Attorney at Law, for Appellee.

MICHAEL O'SHEA, Attorney at Law, for Appellee.

DEREK CEK, Guardian ad Litem.