[Cite as *In re L.S.*, 2018-Ohio-5116.]

STATE OF OHIO          )             IN THE COURT OF APPEALS
                          )ss:        NINTH JUDICIAL DISTRICT
COUNTY OF SUMMIT    )

IN RE: L.S.                          C.A. No.      28475
     A.S.
     L.S.

                                      APPEAL FROM JUDGMENT
                                      ENTERED IN THE
                                      COURT OF COMMON PLEAS
                                      COUNTY OF SUMMIT, OHIO
                                      CASE Nos.   DN 14-01-0036
                                                DN 14-01-0037
                                                DN 14-01-0038

DECISION AND JOURNAL ENTRY

Dated: December 19, 2018

CALLAHAN, Judge.

{¶1} Appellant Mother appeals the judgment of the Summit County Court of Common Pleas, Juvenile Division, that placed her children L.S., A.S. and Li.S. in the legal custody of Father. This Court affirms.

I.

{¶2} Mother and Father are the biological parents of A.S. (d.o.b. 6/20/05), L.S. (d.o.b. 3/7/07), and Li.S. (d.o.b. 6/19/08). At all times during this matter, Mother and Father were married but involved in divorce proceedings.[1] L.S. is a medically fragile child who suffers from multiple conditions, disabilities, and diseases. Among those are microcephaly, cognitive disabilities, a swallowing disorder, a seizure disorder (referred to by some witnesses as epilepsy),

---

[1] The domestic relations court declined to address child custody and support issues as part of the divorce proceedings because the children were subjects of an ongoing dependency/neglect/abuse action.

and sleep issues. He is substantially nonverbal and has frequently used a wheelchair, although he can walk. L.S. also receives the bulk of his nutrition via a g-tube, although he is able to eat a few types of food by mouth. A.S. has allergies and asthma but is otherwise healthy and developmentally on track. Li.S. has no physical, developmental, or health issues.

{¶3} Based on allegations of the overmedication of L.S., Summit County Children Services Board ("CSB" or "the agency") filed complaints alleging L.S. to be an abused, neglected, and dependent child, and alleging A.S. and Li.S. to be dependent children. Mother moved out of the family home, and CSB obtained an order of emergency temporary custody to Father under the protective supervision of the agency. Mother was permitted to have weekly supervised visitation with A.S. and Li.S. only.

{¶4} At the adjudicatory hearing, CSB amended its complaint relating to L.S. to withdraw the allegation of abuse, as well as certain alleged grounds for neglect and dependency. Mother and Father waived their rights to a hearing, and the parties stipulated that L.S. was a neglected and dependent child, and that A.S. and Li.S. were dependent children. At the subsequent dispositional hearing, Mother and Father again waived their rights to a hearing, and the parties agreed that the best interest of the children warranted their placements in the temporary custody of Father with an order of protective supervision to the agency. Mother was granted five hours of supervised visitation with A.S. and Li.S. each week, as well as phone contact six evenings each week. Mother was to have no contact by any means with L.S. The juvenile court adopted the agency's proposed case plan as the order of the court.

{¶5} At a subsequent review hearing, the trial court modified Mother's visitation to allow her one hour of supervised visitation each week with L.S. Later, the court allowed her a

two-hour supervised visit with L.S. every other week. She exercised those visits for approximately four months.

{¶6} Father filed a motion for legal custody and to terminate the agency's protective supervision. A couple months later, CSB filed a motion for legal custody to Father and to terminate its protective supervision. The juvenile court scheduled a three-day hearing. Due to numerous continuances and other issues, the legal custody hearing ultimately took place on eight separate days over a span of more than eight months, from October 29, 2014, through July 9, 2015. Seven months after the first hearing date, Mother filed a motion for legal custody and for a six-month extension of temporary custody. After the legal custody hearings concluded, but before the magistrate issued her decision, the juvenile court terminated Mother's visitations with L.S.

{¶7} The magistrate issued a decision granting Father's and CSB's motions for legal custody to Father and terminating protective supervision, and denying Mother's motion for legal custody. Mother was granted weekly supervised visitation with A.S. and Li.S. at a paid supervised visitation center, and she was ordered to have no contact of any type with L.S. Mother was ordered to pay child support in the statutory minimum amount of $50.00 per month/per child. The juvenile court adopted the magistrate's decision the same day.

{¶8} Mother filed timely objections to the magistrate's decision, arguing that the orders regarding custody and visitation were not supported by the evidence. She reserved leave to file supplemental objections after the transcripts of the hearings were filed. Father also filed objections relating solely to the child support order. Before the juvenile court ruled on the objections, the parties agreed to modify Mother's child support obligation on an interim basis, in consideration of the final spousal support order issued in the parties' divorce decree.

Specifically, the parties agreed that Mother would have a monthly $1,050.00 child support obligation, which would be offset against the $2,500.00 per month in spousal support that the domestic relations court ordered Father to pay Mother. Accordingly, pending the juvenile court's ruling on the objections, Father would only pay Mother two $725.00 semi-monthly spousal support payments instead of two $1,250.00 semi-monthly payments.

{¶9} After the transcripts were filed, Mother moved to supplement her objections and requested a "new trial," because she believed the errors that allegedly occurred during the 8-day hearing were too numerous to address merely via objections. She noted the same objections as in her initial objections and made some brief arguments challenging the adequacy of the evidence. Father and CSB responded in opposition to Mother's objections and motion for a new trial. The juvenile court denied Mother's request for a new trial and granted Mother an additional two weeks to file a brief in support of her objections. Mother did not further supplement her objections. The juvenile court issued a judgment, sustaining Father's objections and overruling Mother's objections. The trial court ordered the children into the legal custody of Father and terminated the agency's order of protective supervision. Mother was granted weekly supervised visitation with A.S. and Li.S. at a commercial visitation center. Although the juvenile court denied Mother visitation with L.S., the court noted that it would be hearing Mother's motion to modify visitation in the near future. Mother was ordered to pay child support for the three children in an amount that was approximately $300.00 less per month than the amount agreed to in the interim order, with no offset against her spousal support award. Mother filed a timely appeal in which she raises three assignments of error for review. This Court considers some assignments of error out of order to facilitate review.

II.

**ASSIGNMENT OF ERROR I**

THE MAGISTRATE IN THIS MATTER DEMONSTRATED CLEAR BIAS AND A PREDISPOSITION AS TO THE OUTCOME OF THIS CASE, THROUGHOUT THE HEARING, AND THROUGH COURT ACTIONS WHICH UNDULY PREJUDICED [MOTHER].

{¶10} Mother argues that the juvenile court erred by granting legal custody to Father in the face of the magistrate's clear bias against Mother. Because Mother failed to preserve the issue for appeal, this Court declines to address it.

{¶11} A party must preserve a challenge alleging bias by a magistrate either by filing a motion to remove the magistrate with the trial court or by raising the issue in objections to the magistrate's decision. *See In re B.W.*, 9th Dist. Lorain No. 16CA010933, 2017-Ohio-1180, ¶ 8-9; *see also* Juv.R. 40(D)(3)(b)(iv). Here, Mother did not file a motion in the juvenile court to remove the magistrate. Instead, she filed a motion to transfer the case to the judge's docket, based in part on her assertion that, regardless of any decision by the magistrate, one or both of the parties would likely file objections, leaving the children "in limbo regarding the permanency of their living arrangements."

{¶12} To the extent that her motion could be construed as a motion to remove the magistrate, Mother alleged bias "based on prior rulings" and "instance[s] of ex parte communication * * *." She filed her motion several months after the first day of the eight-day hearing, but approximately three months before the second day of hearing. Accordingly, her motion could not have alleged instances of bias that might have occurred on days two through eight of the hearing before the magistrate. On appeal, however, Mother argues bias based on events that allegedly occurred during the fifth day of the hearing.

{¶13} In her initial objections to the magistrate's decision, Mother did not raise the issue of bias. In her supplemental objections, filed after the filing of the transcripts, Mother made only a passing reference to bias. She quoted the magistrate's decision in which the magistrate relied on "the credible evidence provided by several witnesses other than Dr. Thomas" to find that Mother exhibited characteristics consistent with a diagnosis of Munchausen Syndrome by Proxy. Mother's full argument relating to bias consisted of the following: "The Magistrate did not list which witnesses, other than Dr. Thomas, that give her the ability to diagnose Mother. This appears wholly inappropriate, leaning toward bias." She did not develop the bias argument further. She has abandoned that argument on appeal and now attempts to formulate an argument for bias based on matters that occurred on the fifth day of hearing that she failed to challenge below.

{¶14} Mother did not preserve her challenges to the magistrate's pronouncements on the fifth day of hearing, which allegedly demonstrated the magistrate's "predisposition to the outcome reached," when she failed to raise them in her objections in the juvenile court. As she has further not argued plain error on appeal, this Court does not reach the merits of Mother's argument. *See In re N.C.*, 9th Dist. Summit Nos. 27116 and 27118, 2015-Ohio-1627, ¶ 28. Mother's first assignment of error is overruled.

## ASSIGNMENT OF ERROR III

THE TRIAL COURT'S FINDINGS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶15} Mother argues that the juvenile court's findings are against the manifest weight of the evidence. Specifically, Mother challenges the court's findings as they relate to the award of legal custody to Father, visitation, and child support. Mother's arguments are not well taken.

{¶16} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

LEGAL CUSTODY

> On appeal, an award of legal custody will not be reversed if the judgment is supported by a preponderance of the evidence. Preponderance of the evidence entails the greater weight of the evidence, evidence that is more probable, persuasive, and possesses greater probative value. In other words, when the best interest of the child is established by the greater weight of the evidence, the trial court does not have discretion to enter a judgment that is adverse to that interest. Thus, our standard of review is whether a legal custody decision is against the manifest weight of the evidence.

(Internal citations and quotations omitted.) *In re M.F.*, 9th Dist. Lorain No. 15CA010823, 2016-Ohio-2685, ¶ 7.

{¶17} "Following an adjudication of neglect, dependency, or abuse, the juvenile court's determination of whether to place a child in the legal custody of a parent or a relative is based solely on the best interest of the child." *In re K.H.*, 9th Dist. Summit No. 27952, 2016-Ohio-1330, ¶ 12. "The critical inquiry before awarding legal custody is to consider the current parenting abilities of each potential custodian and to determine whether it is in the best interest of the child[ren] to be placed in the legal custody of any of them." *In re K.D.*, 9th Dist. Summit No. 28459, 2017-Ohio-4161, ¶ 24, citing *In re K.C.*, 9th Dist. Summit Nos. 26992 and 26993, 2014-Ohio-372, ¶ 20.

{¶18} The statutory scheme regarding an award of legal custody does not include a specific test or set of criteria, but Ohio courts agree that the juvenile court must base its decision to award legal custody on the best interest of the children. *In re B.B.*, 9th Dist. Lorain No. 15CA010880, 2016-Ohio-7994, ¶ 18, quoting *In re N.P.*, 9th Dist. Summit No. 21707, 2004-Ohio-110, ¶ 23. In that regard, the juvenile court is guided by the best interest factors enunciated in R.C. 2151.414(D) relating to permanent custody. *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 9, citing *In re T.A.*, 9th Dist. Summit No. 22954, 2006-Ohio-4468, ¶ 17. Those factors include the interaction and interrelationships of the children, the children's wishes, the custodial history of the children, the children's need for permanence, and whether any of the factors in R.C. 2151.414(E)(7)-(11) are applicable. R.C. 2151.414(D)(1)(a)-(e); *see also In re B.C.*, 9th Dist. Summit Nos. 26976, 26977, 2014-Ohio-2748, ¶ 16. In addition, the juvenile court may also look to the best interest factors in R.C. 3109.04(F)(1) for guidance. *In re K.A.*, 9th Dist. Lorain Nos. 15CA010850, 15CA010860, 2017-Ohio-1, ¶ 17. While some factors overlap with those above, others include the children's adjustment to their environment; the mental and physical health of all persons involved; the parents' history of providing support and honoring companionship orders; certain indicia of violence, abuse, or neglect in any household involved; and whether a parent plans to or has established a residence outside of Ohio. R.C. 3109.04(F)(1).

{¶19} Mother focuses her argument to challenge the testimony of Drs. Aimee Thomas and R. Darryl Steiner, as well as the evidence of the results of her parenting evaluation, specifically as such evidence implicates a diagnosis of Munchausen by Proxy. The juvenile court, however, did not base its award of legal custody of the children to Father on a finding that Mother suffered from Munchausen by Proxy. Instead, the juvenile court found "by a

preponderance of the evidence that an award of legal custody to [F]ather is in the best interest of the children, *regardless of whether [M]other has been diagnosed with Munchausen by Proxy*." (Emphasis added.) The juvenile court thereafter conducted a thorough review of the evidence in relation to the statutory best interest factors. Accordingly, Mother's argument about whether the challenged evidence might or might not have resulted in a diagnosis of Munchausen by Proxy provides limited insight into a determination of whether the juvenile court's award of legal custody to Father is against the manifest weight of the evidence.

**{¶20}** Mother further argues that an award of legal custody to Father is against the manifest weight of the evidence because she complied with her case plan objectives. "While it is relevant to the best interest determination, this Court has repeatedly recognized that a parent's compliance with case plan objectives is not dispositive of the issue." *In re L.T.*, 9th Dist. Summit Nos. 28788 and 28789, 2018-Ohio-1487, ¶ 12, citing *In re E.G.*, 9th Dist. Medina No. 16CA0075-M, 2017-Ohio-2584, ¶ 15, citing *In re T.W.*, 9th Dist. Summit No. 27477, 2016-Ohio-92, ¶ 17. Accordingly, this Court will consider Mother's case plan compliance only where relevant to the best interest of the children.

**{¶21}** In her limited argument touching on the best interest of the children, Mother contends that the manifest weight of the evidence supported an award of legal custody to her because Mother's treating professionals deemed her not to be a threat to the children, and because she is capable of providing for the care of the children. Based on a thorough review of the evidence, this Court concludes that the juvenile court's finding that an award of legal custody to Father is not against the manifest weight of the evidence.

Background

{¶22} In 2012 and 2013, L.S. began experiencing what Mother at first described as seizures, but what were later described as dysautonomic events. Dysautonomia is a condition affecting the nervous system and presented in L.S. with symptoms of very low heart and respiratory rates, low body temperature, extreme lethargy, and an inability to rouse. After one of these events, the child would often sleep for over 30 hours. On a few occasions, the child was reportedly close to death during these events. Excessive doses of Clonidine produce these same symptoms. Clonidine was one of L.S.' prescribed medications. It was administered to help the child sleep. The doses would typically become effective 30 minutes to two hours after administration. L.S.' dysautonomic events almost always occurred in the mornings after L.S. left Mother's care and arrived at school.

{¶23} In the spring of 2013, one of L.S.' nurses began to suspect that Mother was overmedicating L.S. to cause his dysautonomic events. The child's in-home nurse informed Father regarding her suspicion. The nurse then implemented a medicine count in the home to track the amount of medication L.S. was receiving. Both parents were aware of the medication count protocol, but Mother believed it was initiated because of another nurse's medication error.

{¶24} Others also began suspecting that something was amiss. L.S.' multiple medical providers gathered at Children's Hospital to discuss his medical situation and to determine whether the child was being subjected to medical abuse and, if so, by whom. In fact, the medical professionals proposed hospitalizing L.S. to remove him from his home environment, specifically Mother, to see if the child's condition improved.

{¶25} On October 26, 2013, while both parents were home with the children on a Saturday, Father caught Mother trying to hide a Clonidine pill she had in her hand as she was

preparing to feed L.S. After Father confronted Mother with the suspicions that Mother was overmedicating L.S. with Clonidine and causing his dysautonomic events, he gathered the children and took them to the police station. Mother left the family home that day and has never returned. During the 20-month pendency of the case, Mother spent approximately ten supervised hours with L.S., despite the eventual opportunity for two-hour bi-weekly visits. She had weekly five-hour supervised visitations with A.S. and Li.S.

Custodial history of the children

{¶26} Prior to Mother's vacating the family home in October 2013, the children had always lived there with both Mother and Father. After Mother left the family home, the children remained in the home exclusively in Father's custody during the 20-month pendency of the case. The children have never been out of Father's custodial care during their lives.

Interaction and interrelationships of the children; Children's adjustment to their environment

{¶27} The children are very closely bonded with one another. Both A.S. and Li.S. show special affection for their brother L.S. The principal at the school where all three children attend has witnessed a loving relationship amongst the children. A.S. is an engaging child who participates in many extracurricular activities with other children. The guardian ad litem also described Li.S. as "engaging and open." Despite his limitations, L.S. is affectionate and outgoing with classmates, as well as school and other support staff.

{¶28} The guardian ad litem and visitations supervisors all testified that Mother is always appropriate with A.S. and Li.S. during visits. She brings craft projects and engages the children in other activities which hold their interest. Mother and the two children share a close bond and clearly love one another. Mother has had only a few hours of interaction with L.S. in twenty months. Those supervised visitations took place with A.S. and Li.S. present. Those visits

occurred at the YMCA and in the home of Mother's friend. Neither location was suitable for a child with L.S.' special needs, thereby hindering Mother's ability to take full advantage of her opportunity to visit with each child. Thereafter, Mother asked to stop her visits with L.S., because he demanded every bit of her attention and focus, so that she was unable to focus any attention on her other two children. Although the guardian ad litem testified that Mother could have pursued additional visitation with L.S., Mother declined, further asserting that it was too expensive. Although Mother testified that L.S. ran to her and hugged her during their first visit, the visitation supervisor disputed that. Mother was heard to tell L.S. that she loved him only at her first visitation.

{¶29} By all accounts, Father and the three children enjoy close and loving relationships with one another. Everyone who had the opportunity to observe Father with the children testified that he is appropriate, attentive, and committed to the children, and that the children are comfortable and happy with Father. The caseworker testified that Father was able to manage the special needs of L.S., even while interacting with A.S. and Li.S.

{¶30} Because the children have remained in the home they knew when Father and Mother were together, they have experienced no adjustment issues with their physical accommodations. A.S. and Li.S., along with Father, have engaged in in-home counseling to address issues regarding Mother's absence from the home and the parents' then-impending divorce. The children continue to engage in counseling, and Father has indicated his intent to continue them in counseling after these proceedings have been resolved.

Children's wishes

{¶31} L.S. is nonverbal and was unable to convey his wishes. The guardian ad litem reported that A.S. expressed a desire to live with both Father and Mother. Li.S. told the guardian

that she wants to continue living with Father and her brothers. Both A.S. and Li.S. would like to be able to spend more time with Mother. In the interest of consistency and security, the guardian ad litem recommended legal custody to Father as being in the best interest of the children. Based on Mother's mental health issues, the guardian recommended no visitation with L.S. and continued supervised visitation with A.S. and Li.S.

Parents' history of providing support and honoring companionship orders

{¶32} At all times during this case, Father has financially provided for the children's needs. Mother had not paid any child support until the juvenile court entered the agreed interim child support order pending the court's ruling on the objections. Mother did pay half, or sometimes all, of the costs associated with her supervised visitations. In addition, Mother bought the children coats, several pairs of shoes, and bicycles.

{¶33} Visitation presented an ongoing issue for the parties. Despite clear court orders enunciating the visitation parameters (days, times, locations, and the supervisor), Mother routinely sought to modify various aspects of her visitation. She frequently drew the visitation supervisors into the mix, asking them to ask Father if the location of the visits could be changed to accommodate various activities she wanted to do with the children. The visitation supervisors became confused and often sought clarification from various attorneys, the caseworker, the guardian ad litem, and Father about where the visits could occur, and who could supervise. Even when reminded regarding the uncomplicated language of the visitation order, Mother pushed for others to seek alternative opportunities for her. Through it all, however, Father accommodated the vast majority of Mother's requests. Multiple witnesses testified that Father was cooperative with Mother, and always ensured that she was able to make up any visitation time she missed due to the unavailability of a visitation supervisor. Mother had no complaints that Father

deprived her of any visitation with the children or that he did not cooperate with her when she requested accommodations.

Mental and physical health of all persons involved

{¶34} Li.S. is in good physical health and does not present with any health issues. In 2012 and 2013, A.S. was allegedly experiencing significant issues involving allergies and asthma. He was receiving allergy shots and using two types of inhalers every day. Because of these alleged issues, he was first subjected to noninvasive tests and, later, to more invasive tests. He underwent an acid reflux test, a swallow test, and a vocal cord test. He was submitted to a test to rule out cystic fibrosis. Ultimately, he underwent a bronchoscopy and an endoscopy, both of which were invasive and required full sedation of the child. These successive and progressively more invasive medical procedures to address A.S.' allergies and asthma occurred in the couple years before Mother left the family home. However, he has not required further testing or procedures since Mother's departure. His allergies are currently well-managed, and he only occasionally uses an inhaler. Both A.S. and Li.S. remain in counseling to address issues arising out of their parents' divorce and the reasons why the children may only have limited and supervised visitation with Mother.

{¶35} L.S. has significant physical and intellectual disabilities, and he will require care throughout his entire life. Although he has a seizure disorder, his seizures have been rare since Mother left the family home. Moreover, since Mother's departure, L.S. has not experienced any dysautonomic events. The caseworker testified that since she has been involved (since November 2013), L.S. has not required any emergency medical treatment. Father testified that L.S.' prior diagnosis of dysautonomia has since been determined to be erroneous, and that the child's prior episodes were as a result of overmedication of Clonidine.

{¶36} Multiple witnesses testified that L.S.' condition improved in many ways since Mother's absence from his life. School staff remarked that the changes in L.S.' behavior and abilities were phenomenal. The child is no longer lethargic and non-responsive. Instead, he smiles, makes sustained eye contact, and is able to focus on the task at hand for a significant period of time. He interacts appropriately and responsively with peers and staff. His comprehension skills have greatly improved. L.S.' principal testified that the child has "really come to life" in the past year and a half.

{¶37} There was no evidence that Father suffers from any physical or mental health issues. Father engaged in counseling with the children as required by the case plan, and he remains cooperative and willing to continue any counseling recommended for the benefit of the children. Although Father admitted taking an anti-depressant for a short period of time a couple years ago, he explained that he did so after learning about Mother's marital infidelity. Mother's betrayal was a shock to Father, and he sought help to cope with that stress. Father no longer uses an anti-depressant.

{¶38} Mother has struggled with mental health issues throughout this case. In October 2013, after Father initially confronted her with his suspicions that she was poisoning L.S., Mother bought a bottle of sleeping pills and a bottle of aspirin or acetaminophen, drove to a motel, and took all the pills. She then called Father but was unable to reach him. Mother then called a neighbor and asked her to tell Father that she (Mother) had taken some pills. The neighbor called 911 and Mother was taken to the hospital psychiatric ward, where she stayed for 14 days after her suicide attempt. In December 2013, Mother was again admitted to the hospital based on "suicide ruminations" and another possible suicide attempt. That time, she remained in the hospital for four weeks for inpatient treatment, followed by a few sessions of outpatient

treatment. The psychiatrist who saw Mother during her second hospitalization diagnosed her with major depression with psychosis (paranoia), and prescribed various psychotropic medications to address Mother's sleep and anxiety issues.

{¶39} Dr. Aimee Thomas, a licensed psychologist from Northeast Ohio Behavioral Health, performed a 4½-hour parenting assessment of Mother to identify her strengths and weaknesses regarding her ability to parent.[2] Dr. Thomas considered all aspects of Mother's life, including housing, employment, mental health, substance abuse, support systems, the special needs of the children, and the safety and stability of the home. The parenting evaluation took more than twice the traditional time due to the complex issues involved in this case, including the allegation that Mother had poisoned one of her children.

{¶40} Dr. Thomas agreed that Mother suffers from major depression with psychosis. In addition, she identified various "characterological problems" that interfered with Mother's participation in treatment. Although she was not comfortable rendering specific personality disorder diagnoses, Dr. Thomas testified that Mother presents with many features of histrionic, narcissistic, borderline, and dependent personality disorders. Specifically, Mother exhibits the attention-seeking and dramatic behaviors associated with histrionics; the grandiosity, sense of entitlement, and lack of connection or empathy for others associated with narcissism; and toleration of a dysfunctional relationship with Father (as reported by Mother) associated with dependency. Dr. Thomas further described Mother as impulsive and erratic, making decisions

---

[2] Because the juvenile court did not rely on evidence of Mother's alleged diagnosis of Munchausen Syndrome by Proxy, and with regard to our subsequent discussion regarding Mother's second assignment of error, this Court does not consider any testimony of Dr. Thomas relating to the issue of Munchausen Syndrome by Proxy.

based on emotions rather than logic. She was not convinced that Mother had gained the necessary insight into her issues to fully embrace treatment. The psychologist recommended that Mother continue participating in mental health treatment with a counselor, and consult with a psychiatrist regarding medications. Dr. Thomas testified that Mother's complex mental health issues will require years of treatment, and Mother readily agreed.

{¶41} Mother's counselor, a psychological assistant at Premier Behavioral Health Services, has been seeing Mother for a year and a half. She testified that early on Mother was very anxious, depressed, and impulsive; lacked focus, particularly an ability to stay in the moment; and had suicidal ideations. The counselor believed that Mother initially sabotaged her treatment by being defensive. She has seen some improvement, but Mother still presents a challenge due to her self-focus and proclivity to speak and not listen. Despite her individual counseling, Mother was referred to participate in intensive outpatient treatment in May 2014. She completed that treatment but shortly thereafter began experiencing panic attacks, despite anti-anxiety medications. Due to a personal crisis which triggered her panic attacks, Mother returned to intensive outpatient treatment in September 2014, and completed her second round in December 2014. Although the counselor believes that Mother is fully committed to treatment, she acknowledges that Mother's personality traits are pervasive and require ongoing treatment. The counselor noted that Mother reported that she "fully anticipates needing to remain in treatment for quite some time." Finally, the counselor testified that Mother has not accepted accountability or ownership of the stressors in her life, and that Mother maintains that she did not do anything to harm L.S.

Indicia of violence, abuse, or neglect in the household

{¶42} R.C. 3109.04(F)(1)(h) allows the court to consider whether certain indicia of abuse or neglect has occurred. Relevant to the best interest of the children in this case is "whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or neglected child[.]" *Id.*

{¶43} Both Dr. Steiner and the Summit County Board of Developmental Disabilities investigator testified that they substantiated Mother's overmedication of L.S. with Clonidine, which caused multiple dysautonomic events, some of which brought the child perilously close to death. At a minimum, there existed indicia of neglect for the child's health and well-being.

Children's need for permanence

{¶44} The three children have remained in their family home with Father throughout this entire case. Even so, A.S. and Li.S. have only recently been told about Mother's and Father's divorce. More recently yet, the children's counselor is implementing a plan to explain to them about Mother's issues and why they may only have limited and supervised visits with Mother. The children require, in their best interest, the stability that comes from (1) knowing that they will not be disrupted from their home with Father, and (2) understanding the restrictions on their relationship with Mother and why such restrictions are necessary.

Other factors

{¶45} None of the R.C. 2151.414(E)(7)-(11) factors are applicable. Moreover, neither parent indicated plans to establish a residence outside of Ohio.

Conclusion

{¶46} Based on a review of the evidence, this is not the exceptional case where the finder of fact clearly lost its way and created a manifest miscarriage of justice in awarding legal custody

of A.S., L.S., and Li.S. to Father. The evidence in this case established that Mother, irrespective of any specific diagnoses, overmedicated L.S., several times to the point of putting his life in peril. In addition, Mother has struggled with mental health issues that make her self-focused and negatively impact her ability to adequately parent the children and provide a safe and stable environment for them. Mother agrees with the mental health professionals who testified that she will require ongoing mental health treatment for years. Mother has the support of her parents, but they do not acknowledge that Mother has done anything to harm L.S. Accordingly, the maternal grandparents' home, where Mother currently resides, would not provide a safe and stable environment for the children.

{¶47} On the other hand, the children are safe, secure, and stable in the family home where they have been residing with Father throughout the case. Father has the resources and has demonstrated the commitment to provide for the needs of the children. Unlike Mother, Father has demonstrated the ability to provide attention and care to all three children at one time, even given L.S.' special needs. The children are thriving in Father's care. All three children are doing well in school, and L.S. and A.S. in particular have both shown marked progress since Mother's departure. None of the children have experienced any medical emergencies while in Father's care. A.S. expressed a desire to live with both Father and Mother. If that was not possible, he wished to live with Father, but spend more time with Mother. Li.S. too told the guardian ad litem that she wished to spend more time with Mother, although she wanted to live with Father.

{¶48} Based on a thorough review of the record, this Court concludes that the juvenile court's finding that an award of legal custody to Father is in the best interest of the children is not against the manifest weight of the evidence.

VISITATION

{¶49} "A parent who has lost legal custody of a child, but whose parental rights have not been terminated, retains residual parental rights, including the 'privilege of reasonable visitation.'" *In re K.D.*, 9th Dist. Summit No. 28459, 2017-Ohio-4161, ¶ 27, quoting R.C. 2151.353(A)(3)(c) and R.C. 2151.011(B)(48). This Court reviews the juvenile court's award of visitation for an abuse of discretion. *In re K.D.* at ¶ 26. An abuse of discretion is more than an error of judgment; it means that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). When applying the abuse of discretion standard, this Court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993).

{¶50} Mother makes two distinct arguments regarding visitation. First, she argues that the juvenile court erred by limiting her to supervised visitation with A.S. and Li.S., because she posed no risk of harm to the children. Although Mother asserted in her initial objections to the magistrate's decision that she was objecting to the restriction of visitation to a visitation center, she rescinded that objection in her supplemental objections. Instead, Mother asserted that she would be addressing the issue of restricted visitation solely during the scheduled hearing on her then-pending motion to modify visitation.

{¶51} "Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion * * * unless the party has objected to that finding or conclusion as required by Juv.R. 40(D)(3)(b)." Juv.R. 40(D)(3)(b)(iv). Because Mother withdrew her objection in the juvenile court to the order limiting her visitation with A.S. and Li.S. to a visitation center, she has forfeited the issue on appeal. Moreover, she has not alleged a claim of plain error, and this Court declines to create an argument on her behalf. *In re*

*B.P.*, 9th Dist. Lorain No. 14CA010531, 2015-Ohio-48, ¶ 6, citing App.R. 16(A)(7) and *Cardone v. Cardone*, 9th Dist. Summit Nos. 18349 and 18673, 1998 Ohio App. LEXIS 2028, *22 (May 6, 1998) (noting that it is not this Court's duty to create an appellant's argument).

{¶52} Second, Mother argues that the juvenile court erred by removing the two prior court-ordered visitation supervisors. The juvenile court found that the visitation supervisors failed to maintain neutrality and comply with court visitation orders. The record supports these findings. Both visitation supervisors testified that they would circumvent court orders to assist Mother in her desire to modify visitation times and locations, rather than honor the orders requiring Mother and Father to agree to any changes. One supervisor testified that she believed she could not be held in contempt for failing to comply with the orders issued in the case. Both supervisors further asserted their support for Mother. Because the prior visitation supervisors acknowledged their repeated disregard for the juvenile court's orders regarding visitation, the juvenile court's order removing them was not unreasonable. Accordingly, there was no abuse of discretion.

CHILD SUPPORT

{¶53} As an initial matter, Mother did not file objections to the magistrate's decision which ordered her to pay child support in the statutory minimum amount of $50.00 per month per child. Father, however, filed objections, arguing for a higher support order because Mother was voluntarily underemployed and capable of earning over $30,000.00 a year. He noted that Mother last earned $36,000.00 a year when she worked full-time in 2014-2015. Mother failed to file a brief in opposition to Father's objections or otherwise address the issue of child support below.

{¶54} Here again, Mother raises two issues in her argument that the juvenile court erred in its determination of child support. First, she argues that there was no evidence to support the juvenile court's finding that she was voluntarily underemployed. The determinations of whether a parent is voluntarily underemployed, as well as the amount of potential income to impute, must be based on the facts and circumstances of the particular case. *In re B.S.*, 9th Dist. Summit No. 24605, 2009-Ohio-4660, ¶ 9, citing *Rock v. Cabral*, 67 Ohio St.3d 108 (1993), syllabus. In imputing income, the trial court considers the following factors:

(i) The parent's prior employment experience;

(ii) The parent's education;

(iii) The parent's physical and mental disabilities, if any;

(iv) The availability of employment in the geographic area in which the parent resides;

(v) The prevailing wage and salary levels in the geographic area in which the parent resides;

(vi) The parent's special skills and training;

(vii) Whether there is evidence that the parent has the ability to earn the imputed income;

(viii) The age and special needs of the child for whom child support is being calculated under this section;

(ix) The parent's increased earning capacity because of experience;

(x) The parent's decreased earning capacity because of a felony conviction;

(xi) Any other relevant factor.

R.C. 3119.01(C)(11)(a).

{¶55} There was, in fact, evidence in the record to support the juvenile court's findings that Mother had a college degree and had worked as a teacher before she voluntarily let her license lapse. She admitted that she had earned $36,000.00 per year a number of years earlier as

a teacher. The principal at the primary school where the three children attend testified that a teacher with only a bachelor's degree and no experience would earn $34,000.00 per year in her district. The evidence demonstrated that Mother was currently working as a bookkeeper, but only part-time, for $12.00 per hour. Mother was living with her parents and had no limitation on her time prohibiting her from obtaining full-time employment. Moreover, she had no physical or other restrictions precluding full-time employment. In addition, Mother admitted that there was no child support order in place and that Father was paying the full extent of childcare, healthcare, and household expenses. There is no dispute that one of the parties' three children is medically fragile and requires special care at additional cost. Based on a review of the evidence, this Court concludes that the juvenile court did not err by finding that Mother was underemployed and by imputing an annual income to her in the amount of $36,000.00, upon which it calculated Mother's child support obligation.

{¶56} Second, Mother argues that the evidence established that her child support obligation was offset by a reduction in spousal support she was receiving through the parties' divorce action in the domestic relations court. Mother has failed, however, to cite to the voluminous record to support her assertions. "'An appellant bears the burden of formulating an argument on appeal and supporting that argument with citations to the record and to legal authority.'" *Messer v. Summa Health Sys.*, 9th Dist. Summit No. 28470, 2018-Ohio-372, ¶ 71, quoting *State v. Watson*, 9th Dist. Summit No. 24232, 2009-Ohio-330, ¶ 5, citing App.R. 16(A)(7). In the absence of citations to the record and law in support of her assignment of error, this Court declines to create an argument for Mother. *See Cardone, supra*, at *22.

{¶57} Moreover, Mother disregards the fact that she had not been paying any child support during the pendency of the case until the issuance of the agreed interim order. The offset

of Mother's child support obligation against Father's spousal support payments was merely for convenience of accounting. In addition, Mother disregards the fact that her current child support obligation is approximately $300.00 per month less than her obligation in the agreed interim order and will no longer reduce her spousal support award. As such, she has failed to explain how she is aggrieved. Accordingly, this Court declines to reach the merits of her argument. *See In re R.S.*, 9th Dist. Summit Nos. 27857 and 28073, 2017-Ohio-2835, ¶ 20.

{¶58} Based on the analysis and reasoning articulated above regarding Mother's challenges to the juvenile court's determinations regarding legal custody, visitation, and child support, this Court finds Mother's arguments are not well taken. Mother's third assignment of error is overruled.

## ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED TO THE PREJUDICE OF [MOTHER] BY ADMITTING THE TESTIMONY OF DR. AIMEE THOMAS REGARDING MUNCHAUSEN SYNDROME BY PROXY/FACTITIOUS DISORDER IMPOSED UPON ANOTHER.

{¶59} Mother argues that the juvenile court erred by admitting testimony indicating a diagnosis for Mother of Munchausen Syndrome by Proxy. To the extent that there may have been error, any error was harmless.

{¶60} Mother raises two issues in her challenge to the evidence regarding Munchausen Syndrome by Proxy. First, she argues that Dr. Aimee Thomas' testimony, for various reasons, was not credible or otherwise reliable. Second, she argues that any evidence of her alleged diagnosis could not be considered, because the allegations regarding Munchausen Syndrome by Proxy were stricken from CSB's complaint by agreement of the parties. Mother fails to acknowledge, however, that, unlike the magistrate, the juvenile court did not rely on or even consider any evidence of Mother's alleged diagnosis of Munchausen Syndrome by Proxy in its

determination of custody. It is well settled that "'[a]ny claim of trial court error must be based on the actions of the trial court, not on the magistrate's findings or proposed decision.'" *In re B.G.*, 9th Dist. Summit No. 24187, 2008-Ohio-5003, ¶ 7, quoting *Love v. Love*, 9th Dist. Summit No. 22976, 2006-Ohio-3559, ¶ 15. Here, the juvenile court applied the best interest factors set forth in R.C. 2151.414(D) and R.C. 3109.04(F)(1) to the evidence and concluded that "an award of legal custody to [F]ather is in the best interest of the children, *regardless of whether [M]other has been diagnosed with Munchausen [Syndrome] by Proxy*." (Emphasis added.) Accordingly, the admission of Dr. Thomas' testimony, or the testimony of any other witness, insofar as it related to a diagnosis for Munchausen Syndrome by Proxy for Mother, constituted harmless error, if in fact it was error at all. For the foregoing reasons, Mother's second assignment of error is overruled.

III.

{¶61} Mother's assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run.  App.R. 22(C).  The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

CARR, P. J.
CONCURS.

HENSAL, J.
CONCURS IN JUDGMENT ONLY.

APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

MADELINE LEPIDI-CARINO, Attorney at Law, for Appellee.

HOLLY FARAH, Attorney at Law, for Guardian ad litem.